**PIEDMONT ASSOCIATES, a Georgia Joint Venture, Plaintiff,**

v.

**CIGNA PROPERTY & CASUALTY INSURANCE CO., Defendant.**

**Civ.A.No. 1:91–CV–1840–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 3, 1991.

Donald Leroy Rickertsen, Bisbee, Rickertsen & Herzog, Atlanta, Ga., for plaintiff.

Lowell H. Hughen, Jones, Day, Reavis & Pogue, Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on plaintiff Piedmont Associates' (hereinafter "Piedmont") emergency complaint for stay of the final order of the bankruptcy court or in the alternative, for preliminary injunction against the defendant, Cigna Property & Casualty Insurance Company ("CIGNA"). Piedmont requests this court to stay the bankruptcy court's order pending its appeal.

In order for the debtor (Piedmont) to obtain a stay pending appeal, all four elements of Bankruptcy Rule 8005 must be met. Rule 8005 requires that (1) there is a likelihood of success on the merits; (2) there will be irreparable harm to the debtor if no stay is granted; (3) there is a lack of substantial harm to the creditor if there is a stay; and (4) the relief requested is not contrary to the public interest.

## I. STATEMENT OF FACTS

The sole property in question is an office/apartment building known as "Piedmont Place" in Fulton County, Georgia. The debtor's business is the ownership and operation of this building as a Georgia Joint Venture. CIGNA is the sole secured creditor of the debtor with a perfected security interest in the building.

When Piedmont filed for bankruptcy, CIGNA filed a secured claim in the amount of $11,020,997.75 with the trustee. The amount of the original note was $10,400,000.00. The property has been valued conservatively at $6,700,000.00.[1] Therefore, CIGNA has a secured claim for $6.7 million and an unsecured or deficiency claim for $4.3 million. The other general non-secured creditors' total deficiency is $142,000.00.

1. There is a disagreement as to the current value of the property. Piedmont claims the present value is $6.7 million, while CIGNA claims it is $7.5 million.

Under Piedmont's third-revised plan, CIGNA is the only secured creditor and one of two classes of unsecured creditors. Under this plan Piedmont would execute a secured note in favor of CIGNA for $6,700,000. In addition, Piedmont would pay an interest rate of 10.22% on the outstanding debt. The original contract interest rate on the note was 10.875%. For unsecured creditors the plan, in effect, provides that the debtor will pay both classes 5% of the outstanding claims. The Debtor will pay an additional 80–85% to general non-secured creditors (everyone but CIGNA) outside of bankruptcy. Thus, general non-secured creditors would be paid 85–90% of their outstanding claims while CIGNA would only receive 5%.

Under Piedmont's reorganization plan 80% of the partnership interest would change hands. The sole partner maintaining a property interest is Robert Kern, a 20% partner. Eckfass would take over the other 80% interest in the building. Eckfass would provide $841,000 in new capital contribution for the 80% interest in the property it would assume from the other partners. Eckfass would provide a loan to Robert Kern for the 20% interest he would retain under the plan.

## II. BANKRUPTCY COURT'S FINDINGS

The bankruptcy court (Robinson, J.), after an evidentiary hearing, in its order of July 18, 1991, denied confirmation of Piedmont's third revised reorganization plan for the following four reasons:

(1) the proposed plan violates the "absolute priority rule" of 11 U.S.C. § 1129(b)(2)(B)(ii);

(2) the proposed plan is not "feasible" as required by 11 U.S.C. § 1129(a)(11);

(3) the rate of interest paid to CIGNA is "not adequate" to cover the "present value" in the property as required by 11 U.S.C. § 1129(a)(3); and

(4) the creation of two classes of unsecured creditor violates "good faith" re-

**2.** In relevant part, 11 U.S.C. § 1129 (1979 & Supp.1991) provides:

quirements of 11 U.S.C. § 1129(a)(3) and discriminates against CIGNA in violation of 11 U.S.C. § 1129(b)(1) in regard to voting rights only, not as to treatment of payments.

As a result of denying the debtor's proposed plan, the bankruptcy court lifted the automatic stay pursuant to 11 U.S.C. § 362, and thereby allowed CIGNA to foreclose on the property in question.

Piedmont then brought an emergency motion for stay pending appeal before the bankruptcy court. The bankruptcy court held a hearing on said motion on August 2, 1991. The court declined to grant a stay, finding that the debtor had failed to meet its burden on two of the four elements required under Bankruptcy Rule 8005. Specifically, Piedmont had not shown (1) a likelihood of success on the merits and (2) irreparable harm to the debtor.

■ This court's standard of review as to the bankruptcy court's findings of fact will be to uphold those findings unless they are "clearly erroneous" and as to the issues of law will be "de novo." *In Re Chase and Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir.1990).

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

This court finds that the debtor, Piedmont, has not met its burden of showing a likelihood of success on the merits on its pending appeal in order for this court to stay the order of the bankruptcy court. Without expressing an opinion as to the feasibility of the plan or the adequacy of the interest rate paid under the plan, this court finds that the plan cannot succeed as a matter of law because (1) the plan violates the good faith requirement of 11 U.S.C. § 1129(a)(3) and discriminates against CIGNA by denying it appropriate voting rights in violation of 11 U.S.C. § 1129(b)(1); and (2) the plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).[2]

(a) The court shall confirm a plan only if all of the following requirements are met:

## A. CLASSIFICATION

■ By creating two classes of unsecured creditors, Piedmont effectively nullified the voting rights of CIGNA because confirmation of the plan only required approval of one class of unsecured creditor. *See In re Valrico Square Ltd. Partnership,* 113 B.R. 794, 795 (Bkrtcy.S.D.Fla. 1990). This court notes that it is permissible to place similar claims in different classes. *See Matter of Huckabee Auto Co.,* 33 B.R. 132, 137 (Bkrtcy.M.D.Ga.1981). However, this court further notes that "[a]lthough the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited.... [I]f the classifications are designed to manipulate class voting, ..., the plan cannot be confirmed. [Cits.]." *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir.1990). Absent valid business justification, similarly situated creditors should be classified together to prevent discrimination. *See* 11 U.S.C. § 1122(a).[3]

> (3) The plan has been proposed in good faith and not by any means forbidden by law.
> (8) With respect to each class of claims or interests—
>> (A) such class has accepted the plan; or
>> (B) such class is not impaired under the plan.
> (b)(1) ... [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, ..., shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
> (b)(2) ... [T]he condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (B) With respect to a class of unsecured claims—
>> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

**3.** "Except as provided in subsection (b) of this section, a plan may place a claim or an interest

Here, Piedmont presented two reasons for classifying CIGNA separately from all other unsecured creditors, the size of the creditor's claims against the debtor and the type of recourse the creditors have against the partners that make up the debtor outside of bankruptcy.[4] This court agrees with the bankruptcy court that these reasons are not valid business justification for a separate classification of unsecured creditor on these facts. Quite to the contrary, these reasons support CIGNA's arguments that Piedmont's plan was created with the intent of preventing CIGNA from having an active voice in any proposed reorganization. By providing monetary incentives outside of bankruptcy, Piedmont manipulated the vote of the small class of unsecured creditors and thereby discriminated against CIGNA in violation of 11 U.S.C. § 1129(b)(1).[5]

## B. ABSOLUTE PRIORITY RULE

■ This court also agrees with the bankruptcy court that Piedmont's proposed plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).[6]

in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." *Id.*

**4.** CIGNA claimed to have limited recourse against the partners under the original deed securing their debt.

**5.** Although both classes of unsecured creditors would receive equal payments under the proposed reorganization plan, approximately 5 cents on the dollar, the members of the unsecured class that does not contain CIGNA would receive additional payments outside of bankruptcy so that they would end up being paid 85–90% of their claims. In addition, it is important to note that the total amount of these unsecured claims is no more than $150,000.00, while CIGNA's unsecured claim is approximately $4,000,-000.00. In effect, Piedmont has bought off the small creditors in order to control the small creditor's vote and "cram down" their reorganization plan upon CIGNA, who has far more liability at stake.

**6.** *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

> [T]he absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a

First, Piedmont claims that the absolute priority rule does not apply to this case because no member of a junior class will receive or retain an interest in the property under the proposed reorganization plan as a result of any prior interest in the property. Piedmont contends that the only prior partner who is maintaining an interest in the property, Robert Kern, is providing new capital for the twenty percent interest that he will maintain under the reorganization plan. Because Mr. Kern is putting up new equity, Piedmont contends that no member of a junior class is receiving or retaining any benefit as a result of a prior interest in the property.[7] This court disagrees.

The problem with Piedmont's argument is that without Mr. Kern's prior interest in the property, he would not be able to maintain a twenty percent interest in the property by providing new equity. *In re Outlook/Century Ltd.*, 127 B.R. 650, 653–654 (Bkrtcy.N.D.Cal.1991). Without Mr. Kern's ability to create and structure the reorganization plan, he would not be able to maintain his interest in the property by "buying" a "new" twenty percent interest without having a public sale. *Id.* at 654. In effect, Mr. Kern is controlling the sale of the property through the reorganization plan and thereby ensuring himself a bargain basement price. "This exclusive right of [the] Debtor's existing partners to obtain equity interests in [the] Debtor itself constitutes property that the partners retain 'on account of' their existing interests. [Cits.]" *Id.* Therefore, Mr. Kern does benefit from his prior interest in the prop-

erty and the absolute priority rule applies. Because Mr. Kern's claims are junior to those of CIGNA, the absolute priority rule is violated and the reorganization plan cannot be confirmed.[8]

Second, Piedmont further contends that should the absolute priority rule apply, the reorganization plan still complies under the new value exception judicially created in *Case v. Los Angeles Lumber Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). Again, this court disagrees.

This court notes that it is not at all clear that the new value exception to the absolute priority rule survives the 1978 codification of the Bankruptcy Code. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988). This court believes that the plain language of § 1129(b)(2)(B) and the intent of Congress precludes the existence of any new value exception to the absolute priority rule. *In re Outlook/Century, Ltd.*, 127 B.R. 650, 656 (Bkrtcy.N.D.Calif.1991); *contra Matter of Greystone III Joint Venture*, 127 B.R. 138, 142 (W.D.Tex.1990).

However, even assuming the new value exception exists, this court does not believe that Piedmont's reorganization plan meets the requirements of the exception. The new value exception was created by the Supreme Court to provide a means for existing owners to participate in a plan of reorganization of an insolvent debtor. Specifically,

It is, of course, clear that there are circumstances under which stockholders

reorganization plan." [Cit.].... Under current law, no Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections [ ] if it fails to comply with the absolute priority rule.
*Id.* at 202, 108 S.Ct. at 966.

7. If Piedmont's argument were accurate, there would be no need for a "new value" exception to the absolute priority rule. Whenever an owner under a reorganization plan retained an interest in the property, but provided new capital for that interest, the owner would argue that the absolute priority rule did not apply because the interest retained was arguably not on account of the owner's past interest but rather on account of the new equity. Clearly, the intent of Con-

gress in creating the absolute priority rule was not to bypass the normal sale provisions of the bankruptcy code but to provide adequate protection to creditors under any proposed reorganization plan by making sure the plan was "fair and equitable." *See Northern Pacific R. Co. v. Boyd*, 228 U.S. 482, 504–05, 33 S.Ct. 554, 560–61, 57 L.Ed. 931 (1913).

8. *See Ahlers*, 485 U.S. at 209, 108 S.Ct. at 970 ("we think the interest [the debtor] would retain under any reorganization must be considered property under § 1129(b)(2)(B)(ii), and therefore can only be retained pursuant to a plan accepted by the creditors or formulated in compliance with the absolute priority rule").

may participate in a plan of reorganization of an insolvent debtor.... Especially in the latter case did this Court stress the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the *old stockholders*.

*Case,* 308 U.S. at 121, 60 S.Ct. at 10 (emphasis added) (footnote omitted). Under Piedmont's reorganization plan, eighty percent of the new money is being provided by Eckfass with the remaining twenty percent being provided by Mr. Kern by way of a loan from Eckfass. In effect, Piedmont's reorganization plan is nothing more than a means to sell the property in question without meeting the Bankruptcy Code sales requirements of 11 U.S.C. §§ 363, 1123(a)(5)(D) and 1129(a)(11).[9] In creating the new value exception, the Supreme Court intended to provide a means for existing owners to participate in a plan of reorganization should some but not all existing creditors refuse to approve the plan. *See Norwest,* 485 U.S. at 202–03, 108 S.Ct.

at 966–67. The Supreme Court did not intend to provide for the sale of property to new owners against the wishes of existing creditors outside the public market place. Therefore, Piedmont's proposed reorganization plan greatly exceeds the scope of the new value exception to the absolute priority rule in violation of 11 U.S.C. § 1129(b)(2)(B)(ii) and cannot be confirmed.[10]

## IV. CONCLUSION

Thus, because Piedmont has not met its burden to prove that the proposed plan is feasible as required by 11 U.S.C. § 1129(a)(11), Piedmont's emergency motion for stay pending appeal is DENIED.

SO ORDERED.

**9.** *See In re Drimmel,* 108 B.R. 284, 290 (Bkrtcy. D.Kan.1989).

What is actually sought by the debtors under their plans and the *Los Angeles Lumber* exception is the right to buy the business without following § 363 or § 1123(a)(5)(D) and § 1129(a)(11), while using § 1129(b)(2)(A) "cram down" to force secured creditors to provide 100% loan-to-value financing for their collateral and ignoring the right to full payment granted to unsecured creditors under § 1129(b)(2)(B)(i). *Id.*

**10.** *See Norwest,* 485 U.S. at 205, 108 S.Ct. at 968 ("[e]ven if Congress meant to retain the *Los Angeles Lumber* exception to the absolute priority rule when it codified the rule in Chapter 11—a proposition that can be debated, [Cit.]—it is clear that Congress had no intention to expand that exception any further").