In re Richard D. DRIMMEL and Sharon K. Drimmel, Debtors/Appellants.

In re Lavurne UNRUH, Debtor/Appellant.

Nos. 89–4245–S, 89–4244–R. Bankruptcy Nos. 87–40940–11, 86–41489–11.

United States District Court, D. Kansas.

Dec. 16, 1991.

William E. Metcalf, Metcalf & Justus, Topeka, Kan., for appellant Lavurne (NMI) Unruh and debtor Richard D. Drimmel.

Charles T. Engel, Cosgrove, Webb & Oman, Topeka, Kan., for appellee Rushville State Bank of Rushville, Mo.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

These two bankruptcy appeals have been consolidated. In each case, the debtor or debtors appeal from a denial of confirmation of a reorganization plan under Chapter 11 of the Bankruptcy Code. In the *Unruh* case, the bankruptcy court denied confirmation after a proffer of evidence from debtor's attorney. In the *Drimmel* case, the bankruptcy court denied confirmation after a full evidentiary hearing. Debtors have stated they have no objection to the findings of fact which are set forth in the bankruptcy court's opinion as follows:

*The Drimmels*

Richard and Sharon Drimmel operate a 220–acre family farm near Atchison, Kansas, legally a sole proprietorship in Richard's name. Richard also works as a foreman for a construction company. They filed a chapter 11 petition and ultimately a disclosure statement and plan. The plan defines five classes of claimants and proposes to pay about 5% on the unsecured creditors' claims. It also provides that the Drimmels will retain their property, subject to secured claims until completion of the plan and free of them thereafter, and will continue to manage their farm. The unsecured creditors, including the Bank, voted to reject the plan. The Drimmels then requested cram down under § 1129(b).

The debtors presented the testimony of a certified public accountant who determined, based on the discounted cash flow from the farm, that it had a going concern value of about $260. The CPA also testified that since the petition was filed the farm must have received almost $700 from Richard's construction wages because its expenses had exceeded its income by that amount. The plan calls for the debtors to donate their labor to the reorganized farm. The farm will receive income from the sale of crops, the rental of equipment, and the "hypothetical" rental of the farm house to the debtors. In addition, the plan relies on the Drimmels' son to continue to provide diesel fuel and machinery repairs to the farm. The Drimmels' attorney is willing to have his fees, estimated to be at least $3,000, paid from their future earnings instead of property of the estate. They assert their labor, their donation of exempt property, and their attorney's deferral of his fees all constitute capital contributions from them to the estate.

*Unruh*

Lavurne Unruh operates a 450–acre farm, acts as a real estate broker, and apparently has the free use of certain grain storage bins. He filed a chapter 11 petition and ultimately an amended disclosure statement and plan. The amended plan defines thirteen classes of claimants and proposes to pay 2% on the unsecured creditors' claims. It also provides he will retain his property, subject to secured claims until completion of the plan and free of them thereafter, and will continue to manage his businesses. At least the unsecured creditors rejected his plan. He has requested cram down under § 112 9(b) .

Unruh claims his operation has little or no going concern value. He intends to contribute his exempt tools of trade to the reorganized enterprise. His attorney is willing to be paid additional fees of about $12,000 from Unruh's future earnings rather than from property of the estate. Like the Drimmels, Unruh asserts his donation of exempt property and his attorney's deferral of his fees would constitute capital contributions from him to the estate.

108 B.R. 284, 285–86.

These cases turn upon the application of the absolute priority rule. The absolute priority rule is codified at 11 U.S.C. § 1129(b). The rule provides that a plan shall be confirmed notwithstanding the objections of a class of creditors if the plan is "fair and equitable" with respect to that class. With respect to a class of unsecured claims, such as the class objecting to confirmation of the Drimmels' plan and Unruh's plan, the term "fair and equitable" is defined at § 1129(b)(2)(B). The plan is "fair and equitable" if:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property.

In sum, under the absolute priority rule, unsecured creditors have an absolute priority over equity interests to receive money or property until the unsecured creditors are paid in full.

In these cases, the bankruptcy court held that the absolute priority rule applied and required denial of confirmation because, under the proposed plans, unsecured creditors were to be paid a fraction of their claims while the debtors, who are junior to the claims of the unsecured creditors, retain property or an interest in their farms. The bankruptcy court further held that there was no "new value exception" to the operation of the absolute priority rule under the Bankruptcy Code. Therefore, debtors could not justify retaining an interest on the grounds that they were investing labor or capital in the plan. Finally, the bankruptcy court held that, even if the "new value exception" applied, debtors had failed to demonstrate that the exception should be applied on these facts.

The court has reviewed the briefs in the matter and listened to oral arguments. After full consideration, the court shall affirm the decision of the bankruptcy court in these cases.

The standards for reviewing the bankruptcy court's decision are well-settled. The bankruptcy court's findings of fact must be upheld unless they are clearly erroneous. Bankr.R. 8013; *In re Mullet*, 817 F.2d 677, 678 (10th Cir.1987). The bankruptcy court's legal determinations are reviewed *de novo*. *In re Yeates*, 807 F.2d 874, 877 (10th Cir.1986).

■ The first argument of debtors is that "the absolute priority rule should not be applied in sole proprietorship cases where the viability of the reorganized enterprise depends upon substantial contributions of future labor." Debtors make this argument in the face of *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). In *Ah-*

*lers,* the Court applied the absolute priority rule to a sole proprietorship seeking confirmation of a Chapter 11 plan and held that the promised contribution of future labor to the plan did not justify the application of the so-called "new value exception" to the rule. Debtors' contention that the absolute priority rule should not apply to their cases relies upon three points: 1) a statutory construction of § 1129(b)(2)(B)(ii); 2) debtors' view of the history and policy behind the absolute priority rule; and 3) an assertion that any contrary language in the *Ahlers* case is dicta.

Debtors' efforts focus upon the following language: "(ii) the holder of any claim or interest that is junior to the claims or such class will not receive or retain under the plan on account of such junior claim or interest any property." Debtors contend that under their plans they are not receiving or retaining "any property" or, if they are, that they are not receiving or retaining property "on account of" their "interest" in their businesses. Debtors contend that, in contrast to corporations with stockholders who have a legal identity separate from the corporation, a sole proprietor has no legal identity separate from the sole proprietorship. The corporation's assets become part of the bankruptcy estate in a corporate bankruptcy, not the stockholder's assets. The sole proprietor's assets become party of the bankruptcy estate when the sole proprietor files for bankruptcy. Thus, debtors argue that the only time a sole proprietor has an "interest" in the estate is when the sole proprietorship is solvent at the time of filing. Similarly, debtors contend that they will not receive "property" by reason of their alleged "interest" because there is no value to the business they wish to retain.

In support of their construction of the Bankruptcy Code, debtors argue that historically the absolute priority rule was created to deal with corporate bankruptcies and equity receiverships and that the legislative history of the Code speaks of applying the rule to corporate bankruptcies. Debtors also argue that the Supreme Court merely assumed but did not decide that the

rule applied to sole proprietorships in the *Ahlers* case.

■ We reject the arguments of debtors for the following reasons. First, we believe debtors retain an equitable ownership "interest" in their businesses which is cognizable under the statutory absolute priority rule. This equitable interest entitles debtors to a share in future profits of the business. Bankruptcy commentators appear to agree with this view.

The term "interests" is not defined in the Code but is used to mean ownership interests as distinguished from creditors' interests. As such, the term is broader in scope than an equity security, which is defined under the Code to mean a share in a corporation, an interest of a limited partner in a limited partnership, or a warrant or right other than a right to convert, to purchase, sell or subscribe to a share, security or interest of a kind included within the definition. A convertible debenture is not an equity interest, but that does not mean that a convertible debenture holder may not have an interest for purposes of Code § 1123. The legislative history indicates that the term "interest" is broader than an equity security and that it may include the interests of a sole proprietor in a proprietorship, or the interest of common or preferred stockholders in a corporation.

. . . .

In accordance with the absolute priority rule expressed in Code § 1129(b)(2)(B)(ii), an interest holder may not retain an interest or receive any property under a Chapter 11 plan if a nonconsenting class of impaired unsecured claims is not paid in full. Thus, interest holders occupy the lowest level of participation rights in a Chapter 11 case.

2 W. Norton, BANKRUPTCY LAW AND PRACTICE § 59.06 (1990).

The Code does not define the term interest but such term is used to subsume the ownership interest of an individual debtor in his property, the interest of equity security holders as defined in

§ 101, and the interest of general partners in a debtor-partnership. 5 COLLIER ON BANKRUPTCY ¶ 1141.01 p. 1141–6 n. 12 (1991). The legislative history of the Code also reveals that in the context of interests which are subject to cramdown under 11 U.S.C. § 1129(b)(2)(C), an "interest" includes the interest of a sole proprietor in a sole proprietorship. 5 U.S.Code Cong. & Admin.News 5787, 6436, 6477 (1978). Moreover, debtors' construction of § 1129(b)(2)(B)(ii) appears to have been rejected by courts in *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir. 1991); *Piedmont Associates v. Cigna Property & Casualty Ins.*, 132 B.R. 75, 79 (N.D.Ga.1991); and *In re Outlook/Century Ltd.*, 127 B.R. 650 (Bankr.N.D.Cal.1991). Finally, it is obvious that Congress has not expressly excluded sole proprietorships from the application of the absolute priority rule or limited the rule to corporate bankruptcies. For all of these reasons, we believe "interest" should be defined to include the ownership rights of debtors in their businesses in these cases.

■ We also disagree with debtors' contention that they are not retaining "property" for the purposes of the absolute priority rule. This contention is based on the notion that their retention of insolvent enterprises with minimal going concern values should not be considered as the receipt or retention of "property" under § 1129(b)(2)(B)(ii). There is something unreal about this contention. If debtors' businesses are so lacking in value, why are debtors interested in retaining them, why are creditors contesting debtors' reorganization plans, and how could either reorganization plan be capable of confirmation? The Supreme Court recognized this paradox when it stated in *Ahlers:* "And there is great common sense in petitioners' contention that 'obviously, there is some going concern value here, or the parties would not have been litigating over it for the last three years.'" 485 U.S. at 209, 108 S.Ct. at 970. In *Ahlers*, the Supreme Court rejected a "no value" argument similar to that which the debtors have presented in these cases. The Court relied upon what it termed the "consensus of authority". 485

U.S. at 207, 108 S.Ct. at 969. Although debtors contend that the Court couched its comments so that they are dicta for purposes of this case, we cannot read *Ahlers* in any way other than to find that debtors' proposed retention of control over their businesses and right to potential future profits is "property" for the purposes of the absolute priority rule.

Debtors contend that our construction of the Code is contrary to the history of the absolute priority rule and the legislative history of the Code. They note that in pre-Code practice, individual debtors did not face the absolute priority rule in Chapter 11. We admit that the absolute priority rule was created to deal with corporate bankruptcies and equity receiverships. But, as debtors admit, sole proprietorships are mentioned as being subject to the absolute priority rule in the floor debate over the Bankruptcy Code. Furthermore, under the Code, the absolute priority rule need not be satisfied if there is unanimous consent of the creditor classes or, barring such unanimity, if the conditions set out in § 1129(a) & (b)(2) are satisfied. This increased flexibility in the operation of the rule may account for Congress not excluding sole proprietors from the rule's application. In any event, as stated earlier, Congress obviously has not placed any express limitations upon the application of the rule. In the absence of a clear legislative intent to the contrary, the language of the statute, which appears to cover all types of debtors, should control. See *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (stating the basic canon of statutory construction).

There may be some equitable reasons to make reorganization easier for farmers or sole proprietors. Congress has acted to make reorganization easier for farmers by passing the new Chapter 12. In *Ahlers*, the Court emphasized that it is better that Congress pass new legislation than to have the courts misconstrue existing legislation in response to farm bankruptcies.

"[W]hatever equitable powers remain in the bankruptcy courts must and can only

be exercised within the confines of the Bankruptcy Code." 485 U.S. at 206, 108 S.Ct. at 968–69.

"Yet relief from current farm woes cannot come from a misconstruction of applicable bankruptcy laws, but rather, only from action by Congress." 485 U.S. at 209, 108 S.Ct. at 970.

Other courts have also held that it is up to Congress to exclude a class of debtors from a broadly stated rule. See *In re Stegall,* 85 B.R. 510 (C.D.Ill.1987) *aff'd,* 865 F.2d 140 (7th Cir.1989). We agree with this approach. We further note that debtors have not cited any cases holding that sole proprietorships are excluded from § 1129(b). Therefore, for all the reasons stated above, we find that the absolute priority rule does apply to the debtors in these cases.

■ The second major argument of debtors is that their plans satisfy the "new value exception" to the absolute priority rule. The bankruptcy court held that no such exception exists under the Code and that, if the exception did exist, debtors' plans could not meet the requirements for the exception. We agree with the bankruptcy court that there is no new value exception and do not reach the question of whether debtors' plans could satisfy the exception if it existed.

■ The "new value exception" originated in *Case v. Los Angeles Lumber Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939). It is a court-made exception to the absolute priority rule which permits persons to retain an equity interest despite the unpaid claims of senior creditors if they contribute money or money's worth to the reorganized enterprise. Although the exception has been recognized since 1939, it has not often been applied. Indeed, in the case of its birth, *Case v. Los Angeles Lumber Co.,* the Court ultimately held that the proposed contribution was not adequate to satisfy the exception. Recently, in the *Ahlers* case, the Court specifically declined to decide whether the new value exception existed under the current Bankruptcy Code. 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3. Instead, the Court held that even if the

new value exception existed, the proposed contribution of "sweat equity" by the debtors did not establish the exception.

The bankruptcy court in the cases at bar held that the new value exception does not exist for the following reasons. First, it is not explicitly provided for in the Code. The Code specifically defines the term "fair and equitable" to incorporate the absolute priority rule; it omits any exception for new value. The bankruptcy court did not wish to read an exception into the Code. Second, any property retained by debtors is being retained on account of a prior interest, not on account of the new value and, therefore, the statutory provisions of § 1129(b)(2)(B)(ii) are violated by debtors' plans. The bankruptcy court noted that the only reason the debtors might be allowed to make a contribution of new value without competition from other would-be investors is "on account of" their prior interests. Third, the bankruptcy court found that the legislative history demonstrated that Congress rejected the new value exception.

There is a split of authority as to whether the new value exception persists under the Bankruptcy Code. E.g., contrast *In re Greystone III Joint Venture, supra; Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351 (7th Cir.1990) (questioning in dicta the existence of the exception); *Piedmont Associates v. Cigna Property & Casualty Ins., supra; In re Outlook/Century, Ltd., supra;* with *In re Anderson,* 913 F.2d 530, 532–33 (8th Cir.1990) (exception exists); *In re U.S. Truck Co.,* 800 F.2d 581, 587–88 (6th Cir.1986); *In re Tallahassee Associates,* 132 B.R. 712 (Bankr.W.D.Pa. 1991).

The arguments in favor of recognizing the exception suggest that such a construction would promote the equitable goal of reorganization and that when Congress passed the Code it intended to adopt the judicial gloss which had previously been given to the absolute priority rule.

We are more persuaded by the arguments of the bankruptcy court in these cases and by the arguments of the other courts which have rejected the new value

exception under the Code. Congress defined what was "fair and equitable" in the Code. Congress did not include language installing the new value exception. Once again, the language of the Code is entitled to primacy when we are construing it in the absence of a clearly expressed contrary legislative intent. The argument that Congress intended to adopt the judicial gloss given to the prior version of the absolute priority rule discounts the weight which should be given to the statutory language. Furthermore, the legislative history indicates that Congress considered proposals which would have broadened the reorganization opportunities of debtors, including individual debtors. But, these proposals were rejected. The following description of the legislative consideration of the absolute priority rule is taken from Ayer, "Rethinking Absolute Priority After *Ahlers*", 87 MICH.L.REV. 963, 978–79 (1989):

The Code clearly adopted a modified absolute priority rule, but it is crucial here to grasp not only what Congress did, but what it chose not to do. The fountainhead of learning that underlay the 1978 Code was the *Report of the Bankruptcy Commission,* filed in 1973. The *Report* proposed to emasculate substantially the absolute priority rule. Specifically, it would have given broad powers to the reorganization court to leave a stake with the old equity owners even though claims were not paid in full and it would have invited the court to fudge the question of value. It would have given equity owners, even though their interests were eliminated in the plan, a chance to participate if the debtor's fortunes improved at any time up to five years after confirmation—in effect, a sort of option or warrant. Additionally, it would have permitted individual debtors or shareholders to participate in any event, if the court found that they would make an "important" contribution to the reorganized enterprise.

The Commission proposal met with adverse criticism in the law reviews, and in due course Congress abandoned it in favor of the present scheme. That present scheme, in effect, adopts the absolute priority rule as a "default" or "off-the-rack" standard, but permits waiver by consent. It provides that any individual may block confirmation unless he gets at least what he would get in liquidation. Subject to this limitation, it provides that a plan may be binding on any class of creditors if it is accepted by more than half in number, and at least two thirds in amount, of that class.

In the same article, the author concluded:

[The new value] issue was vigorously debated in the development of the current Bankruptcy Code. Under the original proposed draft, a court might have been permitted to do just exactly what the Eighth Circuit proposed to do [in *Ahlers* ]—*i.e.,* allow the former equity holder to participate on the strength of future contribution alone. The matter was vigorously debated in the law reviews, and the act adopted contains no such provision.

*Id.* at 1011. Instead of supporting the existence of the exception, we believe the legislative history of the Code supports the absence of the exception.

Finally, the vagueness of any test for the new value exception was the subject of comment in *In re Greystone III Joint Venture, supra.* Counsel for debtors, in oral argument, also appealed for some guidance in applying the new value exception. This points to a practical problem with the application of a new value exception to the absolute priority rule which would not appear to be easily solved by the courts. In short, there may be legitimate policy reasons in favor of Congress' apparent decision to disallow a new value exception when creditors object and to permit creditors to have greater control in deciding when plans are confirmed. Indeed, the Supreme Court appeared to endorse the principle of creditor control in *Ahlers.* 485 U.S. at 207, 108 S.Ct. at 969.

In conclusion, the court finds that the absolute priority rule was properly applied to the debtors' plans in these cases. We specifically find that there is no new value exception to the operation of the absolute priority rule and, therefore, we do not

reach the question of whether the exception could have been satisfied by debtors in these cases.

The decision of the bankruptcy court in these cases is affirmed.

IT IS SO ORDERED.